UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

PATRICK BUMPUS,

               Plaintiff,

v.

A. NANGALAMA, et al.,

               Defendants.

No. 2:12-cv-1102 TLN DB P

ORDER AND

FINDINGS AND RECOMMENDATIONS

     Plaintiff Patrick Bumpus is a state prisoner proceeding through appointed counsel in this civil rights action filed pursuant to 42 U.S.C. § 1983. Plaintiff contends that defendants Dr. A. Nangalama, Dr. Dhillon, Dr. Sahota, Licensed Vocational Nurse Cox, Licensed Vocational Nurse Teachout, and A. Deems were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.

     Defendants now move for summary judgment on Plaintiff's Eighth Amendment claim on the following three grounds: (1) plaintiff failed to exhaust his administrative remedies as to defendants Deems, Dhillon, Nangalama, Sahota, and Teachout; (2) there is no dispute of material fact as to any of the defendants on plaintiff's deliberate indifference claim; and (3) defendants are entitled to qualified immunity. Plaintiff opposes the motion.

////

1

For the reasons set forth below, the undersigned will recommend that the defendants' motion for summary judgment be granted in part.

Liberally construed, plaintiff's complaint also pleads a retaliation claim against Nurse Cox. On review, the court will also recommend that summary judgment be entered sua sponte for Nurse Cox on this claim.

## I.     Plaintiff's Allegations

In his complaint, plaintiff alleges that the following events occurred while he was incarcerated at California State Prison-Sacramento ("CSP-Sac").  (ECF No. 1.)

Between June 7, 2010, and August 2010, plaintiff repeatedly informed Dr. Sahota that he was suffering from pain and either a cyst or lump on his back, but Dr. Sahota refused to provide plaintiff with pain medication. Plaintiff finally underwent surgery at San Joaquin General Hospital ("SJGH") but only after several months' delay caused by defendants Dr. Nangalama, Dr. Sahota, Dr. Dhillon, and Deems.

From April 7, 2011, to June of 2011, plaintiff was denied adequate post-surgical medical care. As a result, plaintiff was twice taken to the emergency room. Dr. Nangalama, Nurse Cox, Deems, Dr. Dhillon, and Nurse Teachot denied plaintiff daily bandage changes. Defendants also failed to provide post-operative care for plaintiff's "continued excessive bleeding and increased pain." SJGH ordered that, thirty minutes prior to dressing changes, plaintiff receive Vicodin, but Drs. Nangalama and Dhillon interfered with this treatment by denying plaintiff the prescribed pain medication. According to plaintiff, he suffered extreme pain during his dressing changes because he was denied Vicodin.  The surgical wound on plaintiff's back did not heal correctly because of the inadequate medical care he received.

Nurse Cox retaliated against plaintiff because he complained to his mother that he was receiving inadequate medical care, and his mother would then complain to Nurse Cox.

Dr. Nangalama ordered various medicines for plaintiff, which exposed plaintiff to a risk of cancer. Plaintiff continued to bleed and suffer pain around the surgery site until August of 2011.

////

////

2

## II.     Relevant Procedural Background

Plaintiff commenced this action on April 25, 2012. (ECF No. 1.) On March 21, 2013, the court screened the complaint and deemed service appropriate on defendants Nangalama, Cox, Deems, Dhillon, Sahota, and Teachout, as well as subsequently-dismissed defendant Y. Fields. (ECF No. 10.) On July 19, 2013, defendants filed a motion to dismiss, which was denied on February 12, 2014, upon the adoption of the then-assigned magistrate judge's findings and recommendations. (ECF Nos. 20, 31, 34.)

After defendants filed an answer, a discovery and scheduling order ("DSO") issued that was later amended to set deadlines of December 15, 2014, for conducting discovery and March 5, 2015, for filing pretrial motions. (ECF Nos. 35, 39.)

On September 15, 2015, the previously-assigned magistrate judge found sufficient justification for the appointment of counsel. (ECF No. 51.) Accordingly, on April 4, 2017, the undersigned appointed counsel in this matter for the limited purpose of conducting discovery and filing or opposing dispositive motions. (ECF No. 55.) Due to this appointment, the DSO was modified once more, with discovery due by October 4, 2017, and dispositive motions due by December 8, 2017. (ECF No. 56.)

On December 8, 2017, defendants filed the instant motion for summary judgment. (ECF No. 62.) Plaintiff filed an opposition (ECF No. 77), and defendants filed a reply.[1] (ECF Nos. 79-80). This matter is fully briefed and ready for disposition.

## III.     Legal Standard for Summary Judgment

Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil Procedure 56 is met.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

////

---

[1] A stipulation has been filed to extend the deadline for defendants to file their reply. (ECF No. 78.) This stipulation will be adopted, and the defendants' June 8, 2018, reply will be deemed timely filed.

Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c)). "Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory committee's notes to 2010 amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact"). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp., 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists. See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return

4

a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1575 (9th Cir. 1990).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 630. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587; Walls v. Central Costa County Transit Authority, 653 F.3d 963, 966 (9th Cir. 2011). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

## IV.    Undisputed Facts

At all relevant times, plaintiff was a state inmate housed at CSP-Sac. Compl. (ECF No. 1) at 3 § IV. The alleged acts at issue occurred between June 7, 2010, and June 2011. Id. at 6 ¶ 6.

Plaintiff arrived at CSP-Sac on May 20, 2010, and first complained of a knot and tenderness in his back on or around June 23, 2010. Decl. of F. Carter in Supp. of Defs.' Mot.

5

Summ. J. (ECF No. 62-10 at 3-4). Non-party Dr. V.M. Duc examined plaintiff soon thereafter and noted a painful cystic lesion on his thoracic spine. Id. (ECF No. 62-10 at 4). Plaintiff received an MRI on July 2, 2010, and underwent surgery for an upper back lipoma on April 7, 2011.[2] Id. (ECF No. 62-10 at 7); Decl. of Dr. Dena Gu in Supp. of Defs.' Mot. Summ. J. (ECF No. 62-11) Exs. C-D. Plaintiff's claims in this case relate to medical care he received both before and after this surgery.

### 1. Plaintiff's Medical Care

#### a. Pre-Surgery Care

Dr. Nangalama, employed at CSP-Sac as a staff physician, first examined plaintiff on August 31, 2010. Carter Decl. (ECF No. 62-10 at 13); Decl. of A. Nangalama in Supp. of Defs.' Mot. Summ. J. (ECF No. 62-6) ¶¶ 2-3, 6. On examination, Dr. Nangalama noted the lipoma, which he deemed benign and which, under prison rules and guidelines, generally does not require treatment. However, since plaintiff complained of localized pain at the site of the lipoma, Dr. Nangalama referred plaintiff for routine surgery to remove it. He also prescribed plaintiff Tylenol 3, Ibuprofen, and aspirin for pain.

Also on August 31, 2010, Dr. Nangalama submitted a Physician's Request for Services ("RFS") referring plaintiff for routine general surgery to remove the "growing tumor on upper back along vertebral column." Carter Decl. (ECF No. 62-10 at 14); Nangalama Decl. ¶¶ 7-8. This request marked the surgery as "routine" since Dr. Nangalama believed that a lipoma is not itself a serious medical condition and since plaintiff had been prescribed sufficient pain medication to manage the pain associated with it.

Defendant Dr. Sahota, the CSP-Sac Chief Physician and Surgeon, reviewed the RFS submitted by Dr. Nangalama on August 31, 2010. Decl. of P. Sahota in Supp. of Defs.' Mot. Summ. J. (ECF No. 62-7) ¶¶ 1, 17. Dr. Sahota's job duties are largely administrative. Sahota Decl. ¶ 2. While she sometimes treats inmates, she has never treated plaintiff. Id. ¶¶ 2, 10. As part of her duties, Dr. Sahota reviews RFS forms submitted by treating physicians. Id. ¶ 3. Per the

---

[2] A lipoma is a slow-growing fatty lump most often situated between the skin and the underlying muscle layer. Decl. of K. Dhillon in Supp. of Defs.' Mot. Summ. J. (ECF No. 62-5) ¶ 8.

RFS submission process, a physician completes the form; marks it as Emergent, Urgent, or Routine; and submits it to the Utilization Management Nurse ("UM Nurse"). Id. ¶ 4. The UM Nurse logs it into a computer and sends the RFS to Dr. Sahota for review. Id. Dr. Sahota then reviews it to determine the medical necessity and appropriateness of the request. Id. If it includes the relevant information, Dr. Sahota approves it and sends it to the specialty clinic staff or personnel for scheduling. Id. If the RFS is unclear, Dr. Sahota refers it to the Medical Authorization Review Committee ("MARC") for review. Id. Upon receipt, the MARC will convene, review the RFS, and either approve or deny it. Id. During this meeting, Dr. Sahota or the designated physician will record the MARC's decision and sign it on behalf of the MARC. Id.

On review of Dr. Nangalama's August 31, 2010, RFS, Dr. Sahota referred it to the MARC. Carter Decl. (ECF No. 62-10 at 14); Sahota Decl. ¶ 17. The MARC denied this request on September 2, 2010, because it lacked sufficient information for the reviewer to assess if the requested treatment was medically necessary or appropriate. Dr. Sahota noted the denial on the RFS and signed it on behalf of the MARC. Dr. Nangalama was instructed to re-examine plaintiff and resubmit the RFS.

Dr. Nangalama re-examined plaintiff on September 29, 2010, and resubmitted the RFS with more detailed information. Carter Decl. (ECF No. 62-10 at 21); Nangalama Decl. ¶ 12. That same day, Dr. Nangalama prescribed alternative pain medication, methadone, to be taken twice daily; methadone is an opiate used to treat moderate to severe pain. Id. Dr. Nangalama's revised RFS was approved by Dr. Sahota on October 8, 2010. Sahota Decl. ¶ 18.

On October 28, 2010, plaintiff was seen at SJGH by Dr. Christopher Richardson, who ordered a CT scan of his chest to rule out sarcoma (malignant soft tissue tumor). Gu Decl. ¶ 5, Ex. B.

On November 12, 2010, Dr. Nangalama examined plaintiff and, based on Dr. Richardson's orders, submitted a RFS for a CT scan. Carter Decl. (ECF No. 62-10 at 24-25); Nangalama Decl. ¶ 15. He also ordered that plaintiff's pain medication be renewed considering plaintiff's continued complaints of pain. Id. Dr. Sahota approved the RFS for the CT scan on November 22, 2010. Carter Decl. (ECF No. 62-10 at 25); Sahota Decl. ¶ 19.

Neither Dr. Sahota nor Dr. Nangalama was responsible for making the appointment for the CT scan, neither made the appointment, and in fact neither could make the appointment. Sahota Decl. ¶¶ 5, 20; Nangalama Decl. ¶ 13. Scheduling is handled by the designated specialty clinic staff or personnel. Sahota Decl. ¶ 5.

On November 23, 2010, Dr. Nangalama saw plaintiff at the clinic for a medication review / refill. Carter Decl. (ECF No. 62-10 at 30); Nangalama Decl. ¶ 18. His notes indicate the presence of the abnormal back lump, the referral for a CT scan, and the need to follow up with SJGH regarding surgery.

Dr. Nangalama next saw plaintiff on December 22, 2010, for a medication review / refill. Carter Decl. (ECF No. 62-10 at 33); Nangalama Decl. ¶ 19. Plaintiff complained at this appointment that his back pain was getting worse, but he denied any weakness or numbness. An examination noted that the lump was stable and without any acute changes. Dr. Nangalama renewed plaintiff's prescription for methadone and aspirin, and plaintiff continued to be prescribed Ibuprofen.

On January 19, 2011, plaintiff received a CT scan of the thoracic spine at an outside facility. Carter Decl. (ECF No. 62-10 at 37).

On February 22, 2011, plaintiff was examined by Dr. Nangalama. Carter Decl. (ECF No. 62-10 at 40); Nangalama Decl. ¶ 21. Dr. Nangalama again referred to the "palpable painful lump" in plaintiff's back and submitted another RFS for general surgery, noting that the procedure had been approved in late-2010.

On March 11, 2011, Dr. Dhillon, employed at CSP-Sac as a physician/surgeon, examined plaintiff for a routine blood pressure check. Decl. of K. Dhillon in Supp. of Defs.' Mot. Summ. J. (ECF No. 62-5) ¶¶ 2, 7; Carter Decl. (ECF No. 62-10 at 44). Dr. Dhillon discussed plaintiff's CT scan results with him and noted that he was scheduled for surgery.

On March 18, 2011, plaintiff was seen at SJGH and was scheduled for an outpatient surgery for April 7, 2011. Gu Decl. Ex. C.

////

////

### b. Post-Surgery Care

Plaintiff underwent a lipoma surgery on SJGH on April 7, 2011. Gu Decl. ¶ 7, Exs. C-D. The surgery was performed by the attending surgeon and resident surgeon. Id. Following the surgery, Dr. Dena Gu, then a surgical resident at SJGH, prepared the post-operative discharge orders, which included over-the-counter medication as needed for pain and a follow-up appointment in two weeks. Gu Decl. ¶¶ 3, 8. Dr. Gu did not believe that narcotics were necessary for pain since most lipoma removal surgeries are not painful enough to require them. Id.

On April 8, 2011, Dr. Dhillon treated plaintiff and his complaints of pain in the surgical area. Carter Decl. (ECF No. 60-9 at 49-50); Dhillon Decl. ¶ 9. Dr. Dhillon noted no signs of infection and reviewed plaintiff's medication list, which included methadone, Tylenol, and a nonsteroidal anti-inflammatory drug. Dr. Dhillon discussed realistic pain goals; prescribed him a dose of Toradol, an intramuscular pain reliever; and ordered that his bandages be changed daily for three days. She also instructed plaintiff on self-care, including avoiding sleeping on his back and avoiding any touching of the wound site.

On April 15, 2011, plaintiff was seen at SJGH with complaints of wound fluctuance, which means that fluid had collected in his surgical wound site causing the wound to be stretched and cause pain or discomfort. Gu Decl. ¶ 9, Ex. E. The wound was drained, no infection was noted, and plaintiff was returned to CSP-Sac the same day. Id. On his return to CSP-Sac, plaintiff was provided pain medication and placed on the MD line for further evaluation. Carter Decl. (ECF No. 60-9 at 51).

On April 19, 2011, Dr. Nangalama examined plaintiff and noted that plaintiff's "back wound is healing well. No drainage. Swelling has improved." Carter Decl. (ECF No. 60-9 at 52-53).

On April 22, 2011, plaintiff returned to SJGH with complaints of pain and swelling at the surgery site. Gu Decl. ¶¶ 20-23, Ex. F. He also complained that he had been prescribed three antibiotics by CSP-Sac doctors, but Dr. Gu, the examining physician at this appointment, could not independently verify this. Gu Decl. ¶¶ 3, 20. Dr. Gu drained and packed the site. Id. ¶ 20. She then gave directions to have the wound packed daily, which was to prevent fluid build-up at the

site, and that plaintiff no longer take antibiotics because there was no infection to treat. Id. She did not order narcotics at this appointment because she did not see signs of insufficient post-operative care by the prison. Id. ¶ 23.

On April 29, 2011, Dr. Nangalama examined plaintiff and the wound on his back, again noting that it was "healing well." Carter Decl. (ECF No. 60-9 at 58-59). The wound dressing has been twice daily, which he then ordered changed to once daily with packing. He also continued Clindamycin, an antibiotic. Plaintiff accuses Dr. Nangalama of prescribing the antibiotics even though they are cancer-causing, a medical claim he attributes to Dr. Gu. See Pl.'s Dep. at 108:24—109:6; see also Carter Decl. (ECF No. 62-10 at 89-93). Dr. Gu denies that she ever said this to plaintiff since it is not true that the antibiotics cause cancer. Gu Decl. ¶ 21.

Dr. Dhillon next examined plaintiff on May 4, 2011, for a follow-up visit. Carter Decl. (ECF No. 62-10 at 60); Dhillon Decl. ¶ 10. At this appointment, plaintiff stated, and an examination confirmed, that the surgical site was tender. There was no drainage, so Dr. Dhillon ordered that his current regimen of daily dressing and packing changes be continued. She made a notation that plaintiff was scheduled for a follow-up visit at SJGH.

On May 6, 2011, plaintiff returned to SJGH where he was again seen by Dr. Gu. Gu Decl. ¶ 24, Ex. G. Her medical notes reveal that plaintiff was only receiving packing of the wound every other day instead of twice a day, and that despite her previous orders, he was still being prescribed antibiotics. She ordered that his dressing be changed 1-2 times a day because the wound was seeping fluid (not blood), that the antibiotics be stopped, that he receive Vicodin before dressing changes, and lastly that he be provided yogurt until his diarrhea resolves. Dr. Gu ordered the Vicodin because plaintiff complained that the Toradol was not relieving his pain.

Based on Dr. Gu's orders, Dr. Dhillon issued a physician's order on May 6, 2011, for plaintiff's dressing to be changed and wound packed two times per day for two weeks. Carter Decl. ECF No. 62-10 at 63); Dhillon Decl. ¶ 11. She also ordered the discontinuation of plaintiff's antibiotics. Id.

On May 11, 2011, Dr. Dhillon examined plaintiff for a follow-up at the clinic. Carter Decl. (ECF No. 62-10 at 64-67); Dhillon Decl. ¶ 12. At that time, plaintiff complained of having

diarrhea for over a month, which Dr. Dhillon found surprising since he had not mentioned it at all during his several medical appointments. In any event, Dr. Dhillon ordered lab tests to determine the cause and recommended that plaintiff drink fluids. Plaintiff also complained that he had not been prescribed yogurt as recommended by Dr. Gu. Although there was no clear indication for yogurt to be prescribed, Dr. Dhillon agreed to discuss the issue with the MARC.

Lastly, plaintiff complained that he was not being provided Vicodin as recommended by Dr. Gu. Dr. Dhillon informed plaintiff that she could not provide Vicodin per institutional rules, but she could prescribe Tylenol 3. Plaintiff refused the alternative because it made him constipated, a common side-effect that Dr. Dhillon said could be easily treated. Plaintiff again refused the Tylenol 3 and said that he would rely on methadone instead, for which he already had a prescription. On examination, Dr. Dhillon noted that the "[w]ound looks intact, clean" with "[n]o signs of infection." She also wrote: "The nurse who changed his dressing is the same nurse who has been doing his dressing frequently. She also confirmed that his wound has been healing as beautifully as anticipated."

On May 11, 2011, Dr. Dhillon submitted a RFS for plaintiff to be sent to SJGH for a two-week follow-up wound care appointment. Carter Decl. (ECF No. 62-10 at 70); Dhillon Decl. ¶ 13. She also met with Dr. Sahota to discuss plaintiff's request for yogurt to treat his diarrhea. Carter Decl. (ECF No. 62-10 at 69); Dhillon Decl. ¶ 14; Sahota Decl. ¶ 21. On review of plaintiff's clinical and lab evaluations, Dr. Dhillon and Dr. Sahota both agreed that there was no medical indication for yogurt. Id.

On May 12, 2011, Dr. Nangalama also submitted a RFS for follow-up care at SJGH. Carter Decl. (ECF No. 62-10 at 72); Nangalama Decl. ¶ 29. Dr. Sahota forwarded this RFS to the MARC for review. Sahota Decl. ¶ 23. The MARC discussed plaintiff's case and treatment and determined that there was no further need for a follow-up appointment at SJGH. Id. They thus denied Dr. Nangalama's RFS that same day.[3] Carter Decl. (ECF No. 62-10 at 72).

_____

[3] Dr. Dhillon's identical RFS for follow-up care from May 11, 2011, shows that it was approved on May 29, 2011, Carter Decl. (ECF No. 62-10 at 70), but Dr. Dhillon did not pursue the matter in light of the May 12, 2011, denial of Dr. Nangalama's RFS. Dhillon Decl. ¶ 13 n.1.

On May 13, 2011, Dr. Dhillon dictated a Medical Progress Note following the MARC's denial of Dr. Nangalama's RFS the previous day:

> The patient is a 31-year-old African American male who had a lipoma removed from his upper thoracic spine and he developed some wound complications after the surgery. It was brought to our attention by supporting staff that the patient was not strictly following postoperative care instructions. For instance, the patient was asked to avoid sleeping on his back postoperatively. The nursing staff observed that the patient was not following those instructions and there was some suspicions that he may have manipulated his wound as well. Either way, the patient was sent out for wound complications and he had a seroma drained from the wound. The patient was getting appropriate pain control and dressing changes daily. The patient was seen at San Joaquin General Hospital on 05/06/2011 and they asked for a two week followup there and yesterday, before submitting the Referral for Services (RFS) for two week followup and the presence of all the doctors and the Chief Physician and Surgeon in the Medication Administration Record (MAC) Committee, his case was discussed and it was deemed that there is no compelling indication for him to be sent for a two week followup at San Joaquin General Hospital since the wound is healing beautifully as anticipated and we will continue to monitor his care locally in our facility. He will be getting dressing changes daily.

Carter Decl. (ECF No. 62-10 at 71).

On June 13, 2011, Dr. Nangalama examined plaintiff and deemed his wound to be "quite healed now" with "[n]o sign of drainage, no redness, no swelling." Carter Decl. (ECF No. 62-10 at 73-74); Nangalama Decl. ¶ 31. The wound was labeled "now resolved." Id.

### i. Nurse Cox

Nurse Cox was employed at CSP-Sac as a Licensed Vocational Nurse. Decl. of G. Cox in Supp. of Defs.' Mot. Summ. J. (ECF No. 62-3). Following the April 7, 2011, surgery, Nurse Cox changed plaintiff's wound dressings and packed his wound on the following days: April 14, April 21, April 27-28, May 1-4, May 25-28, and June 1-4.[4] Carter Decl. (ECF No. 62-10 at 78-83); Cox Decl. ¶ 8.

During his deposition, plaintiff identified three instances in which Nurse Cox allegedly violated his constitutional rights:

////

---

[4] Plaintiff disputes the accuracy of the time logs, but submits no evidence to rebut them. Pl.'s Dep. at 106:20—107:8.

- The first incident occurred "after Dena Gu's order to [change the dressing] more frequently." Pl.'s Dep. at 100:15-20. (Presumably, plaintiff is referring to Dr. Gu's May 6, 2011, order for dressing changes to occur 1-2 times daily and for pain medication to be provided 30 minutes before the dressing change. See Gu Decl. Ex. F.) At this interaction with Nurse Cox, plaintiff asked for his medication before the dressing change. Id. at 100:21-22. Nurse Cox allegedly responded, "I don't have time for that. Either you're going to get it done now or not." Id. at 101:1-10. Plaintiff endured the wound change without pain medication. See id.

- During the second incident, Nurse Cox gave plaintiff the option of having his dressing changed after waiting for "a little while." Pl.'s Dep. at 89:11-17. When plaintiff declined to wait, Nurse Cox allegedly said, "Well, if you don't want to stay and wait, don't bother coming back." Id.

- During the third incident, plaintiff again asked for medication before the wound change, but Nurse Cox said, "I am not going to do that. I'm not going to keep having this conversation with you. You either get your wound changed or you're not." Pl.'s Dep. at 102:1-14. Nurse Cox then declined to change plaintiff's wound dressing. Id. at 102:15-16.

Plaintiff would complain to his mother regarding his medical care, and she would in turn contact CSP-Sac staff. Pl.'s Dep. at 98:25—99:20. After plaintiff's mom's "diligent" calling, plaintiff asserts that Nurse Cox would retaliate by denying him medication and/or treating plaintiff unprofessionally. Nurse Cox denies these allegations.

### ii. Nurse Teachout

Defendant C. Teachout was employed at CSP-Sac as a Licensed Vocational Nurse. Decl. of C. Teachout in Supp. of Defs.' Mot. Summ. J. (ECF No. 62-8) ¶ 2. Nurse Teachout does not remember providing any care to plaintiff from April to June 2011, and there are no medical records from this period signed by Nurse Teachout that would suggest her involvement or presence in plaintiff's care. See id. ¶ 5.

////

Plaintiff contends that Nurse Teachout changed his dressing on an unspecified date without provided medically-ordered Vicodin. <u>See</u> Pl.'s Dep. at 88:7-24. On another occasion, Nurse Teachout told plaintiff that she would do a dressing change but that he would need to wait 30 minutes outside in a stand-up cage, which plaintiff declined. <u>Id.</u> at 89:9-23.

## V. Motion for Summary Judgment for Failure to Exhaust Administrative Remedies

### A. Legal Standard

The Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(a), requires a prisoner challenging prison conditions to exhaust available administrative remedies before filing suit. <u>McKinney v. Carey</u>, 311 F.3d 1198, 1199 (9th Cir. 2002); 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). Exhaustion is a precondition to suit; exhaustion during the pendency of the litigation is insufficient. <u>McKinney</u>, 311 F.3d at 1199-1200. This requirement promotes the PLRA's goal of efficiency by: "(1) 'giv[ing] prisoners an effective incentive to make full use of the prison grievance process'; (2) reducing prisoner suits as some prisoners are 'persuaded by the proceedings not to file an action in federal court'; and (3) improving the quality of any remaining prisoner suits 'because proper exhaustion often results in the creation of an administrative record that is helpful to the court.'" <u>Nunez v. Duncan</u>, 591 F.3d 1217, 1226 (9th Cir. 2010) (quoting <u>Woodford v. Ngo</u>, 548 U.S. 81, 94-95 (2006)).

"Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." <u>Woodford</u>, 548 U.S. at 90. These rules are defined by the prison grievance process itself, not by the PLRA. <u>Jones v. Bock</u>, 549 U.S. 199, 218 (2007). "[A] prisoner must 'complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court.'" <u>Harvey v. Jordan</u>, 605 F.3d 681, 683 (9th Cir. 2010) (quoting <u>Marella v. Terhune</u>, 568 F.3d 1024, 1027 (9th Cir. 2009)). In California, a grievance must be timely appealed through the third level of review to complete the administrative review process. <u>Harvey</u>, 605 F.3d at 683; Cal. Code Regs. tit. 15, § 3084.1(b).

////

The State of California provides its inmates and parolees the right to administratively appeal "any policy, decision, action, condition, or omission by the department or its staff that the inmate or parolee can demonstrate as having a material adverse effect upon his or her health, safety, or welfare." Cal. Code Regs. tit. 15, § 3084.1(a). In order to exhaust available administrative remedies, a prisoner must proceed through three formal levels of appeal and receive a decision from the Secretary of the CDCR or his designee. Id. § 3084.1(b), § 3084.7(d)(3).

The amount of detail in an administrative grievance necessary to properly exhaust a claim is determined by the prison's applicable grievance procedures. Jones, 549 U.S. at 218; see also Sapp v. Kimbrell, 623 F.3d 813, 824 (9th Cir. 2010) ("To provide adequate notice, the prisoner need only provide the level of detail required by the prison's regulations"). California prisoners are required to lodge their administrative complaint on a CDCR-602 form (or a CDCR-602 HC form for a health-care matter). The level of specificity required in the appeal is described in a regulation:

> The inmate or parolee shall list all staff member(s) involved and shall describe their involvement in the issue. To assist in the identification of staff members, the inmate or parolee shall include the staff member's last name, first initial, title or position, if known, and the dates of the staff member's involvement in the issue under appeal. If the inmate or parolee does not have the requested identifying information about the staff member(s), he or she shall provide any other available information that would assist the appeals coordinator in making a reasonable attempt to identify the staff member(s) in question. [¶] The inmate or parolee shall state all facts known and available to him/her regarding the issue being appealed at the time of submitting the Inmate/Parolee Appeal form, and if needed, the Inmate/Parolee Appeal Form Attachment.

Cal. Code Regs. tit. 15, § 3084.2(a)(3-4).[5]

---

[5] California prison regulations governing inmate grievances were revised on January 28, 2011. Cal. Code Regs. tit. 15, § 3084.7. Several Ninth Circuit cases refer to California prisoners' grievance procedures as not specifying the level of detail necessary and instead requiring only that the grievance "describe the problem and the action requested." See Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (quoting Cal. Code Regs. tit. 15, § 3084.2); Sapp, 623 F.3d at 824 ("California regulations require only that an inmate 'describe the problem and the action requested.' Cal. Code Regs. tit. 15, § 3084.2(a)"); Griffin v. Arpaio, 557 F.3d 1117, 1120 (9th Cir. 2009) (when prison or jail's procedures do not specify the requisite level of detail, "'a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought'").

An inmate has thirty calendar days to submit his or her appeal from the occurrence of the event or decision being appealed, or "upon first having knowledge of the action or decision being appealed." Cal. Code Regs. tit. 15, § 3084.8(b).

However, the Ninth Circuit has held that "a prisoner exhausts such administrative remedies as are available . . . under the PLRA despite failing to comply with a procedural rule if prison officials ignore the procedural problem and render a decision on the merits of the grievance at each available step of the administrative process." Reyes v. Smith, 810 F.3d 654, 658 (9th Cir. 2016); see also Franklin v. Foulk, 2017 WL 784894, at *4-5 (E.D. Cal. Mar. 1, 2017); Franklin v. Lewis, 2016 WL 4761081, at *6 (N.D. Cal. Sept. 13, 2016).

Thus, a prisoner's failure to list all staff members involved in an incident in his inmate grievance, or to fully describe the involvement of staff members in the incident, will not necessarily preclude his exhaustion of administrative remedies. Reyes, 810 F.3d at 658; Foulk, 2017 WL 784894, at *4 ("[T]he court in Reyes found that even though the plaintiff's grievance failed to name two physicians on the prison's three-person pain committee, prison officials were put on notice of the nature of the wrong alleged in the suit -- that the plaintiff was wrongfully denied pain medication."); Lewis, 2016 WL 4761081, at *6 ("[T]o the extent Defendants argue that Plaintiff failed to comply with a procedural requirement by not naming Defendants in [his appeal], this deficiency is not necessarily fatal to Plaintiff's claim pursuant to Reyes"); Grigsby v. Munguia, 2016 WL 900197, at *11-12 (E.D. Cal. Mar. 9, 2016) (appeal pursued through all three levels of review challenged the excessive force incident, and prison officials aware of defendant Baker's involvement); see also Bulkin v. Ochoa, 2016 WL 1267265, at *1-2 (E.D. Cal. Mar. 31, 2016) (declined to dismiss reckless endangerment claims based on failure to name two defendants in appeal because prison officials addressed the claim on the merits, were alerted to the problem, knew the actors involved, and were given an opportunity to rectify the alleged wrong); see also McClure v. Chen, 246 F. Supp. 3d 1286, 1292-94 (E.D. Cal. Mar. 28, 2017) (claim that prison

Such cases are distinguishable because they did not address the regulation as it existed at the time of the events complained of in plaintiff's complaint. Whatever the former requirements may have been, in California since January 28, 2011, the operative regulation set forth above requires specificity in administrative appeals.

officials failed to provide adequate medical attention for an eye injury suffered after falling from his bunk, the same as raised in his federal complaint and pursued until the appeals were granted, was sufficient to exhaust remedies).

Nonetheless, for administrative remedies to be exhausted by California prisoners as to defendants who were not identified in the inmate grievance, there must be a "sufficient connection" between the claim in the appeal and the unidentified defendants such that prison officials can be said to have had "notice of the alleged deprivation" and an "opportunity to resolve it." Reyes, 810 F.3d at 959 (finding that plaintiff had satisfied PLRA exhaustion requirements as to two prison doctors despite not having identified them in his inmate appeals because there was a sufficient connection between plaintiff's appeal based on inadequate pain management, and the doctors, who served on the prison committee that had denied plaintiff medication); McClure, 246 F.Supp 3d at 1293-94 (remedies exhausted even though doctors not named in appeal; prison was placed on notice) ).

An inmate must exhaust available remedies, but is not required to exhaust unavailable remedies. Albino v. Baca, 747 F.3d 1162, 1171 (9th Cir. 2014) (en banc). "To be available, a remedy must be available 'as a practical matter'; it must be 'capable of use; at hand.'" Id. (quoting Brown v. Valoff, 422 F.3d 926, 936-37 (9th Cir. 2005)). "Accordingly, an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" Ross v. Blake, 136 S. Ct. 1850, 1858 (2016) (quoting Booth v. Churner, 532 U.S. 731, 738 (2001)).

Failure to exhaust under the PLRA is "an affirmative defense the defendant must plead and prove." Jones, 549 U.S. at 204. It is the defendant's burden to prove that there was an available administrative remedy, and that the prisoner failed to exhaust that remedy. Albino, 747 F.3d at 1172. "Once the defendant has carried that burden, the prisoner has the burden of production. That is, the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." Id. If the court concludes that the prisoner failed to exhaust available administrative remedies, the proper remedy is dismissal

without prejudice. See Jones, 549 U.S. at 223-24; Lira v. Herrera, 427 F.3d 1164, 1175-76 (9th Cir. 2005).

**B. Plaintiff's Administrative Grievances**

**1. Appeal Log No. SAC-10-10-11910**

On July 28, 2010, plaintiff submitted a health care inmate grievance, Appeal Log No. SAC-10-10-11910 ("Appeal 11910"), complaining that he had not yet been seen by anyone after a July 2, 2010, x-ray of his spine. Decl. of Pl. in Opp'n to Defs.' Mot. Summ. J. Ex. B (ECF No. 77-3 at 16-25). He sought a referral to an outside specialist to determine the severity of his injury, the removal of the "Sac 4 yard doctor" for "allowing [plaintiff] to endure pain without medication," monetary compensation, a medical examination, and a prescription for pain medication. Plaintiff does not identify any individual by name in this appeal.

Plaintiff's grievance was granted in part at the first level of review on September 1, 2010. Pl.'s Decl. Ex. B (ECF No. 77-3 at 19-20.) Dr. Nangalama interviewed plaintiff on August 31, 2010, referred him to general surgery, and prescribed Ibuprofen and Tylenol 3 for pain. Plaintiff's appeal was denied as to the remaining requests.

Plaintiff appealed this decision on September 10, 2010, claiming that the pain medication was ineffective and that he needs to be referred to someone with "higher authority to take control of this situation." Pl.'s Decl. Ex. B (ECF No. 77-3 at 18).

Plaintiff's grievance was partially granted at the second level of review by defendant A. Deems on September 16, 2010. Pl.'s Decl. Ex. B (ECF No. 77-3 at 21-22). Defendant Deems was employed at CSP-Sac as the Chief Executive Officer where he was responsible for healthcare services of inmates and where he reviewed their appeals concerning healthcare matters.[6] Decl. of A. Deems in Supp. of Defs.' Mot. Summ. J. (ECF No. 62-4) ¶¶ 1-2. Deems is not a medical provider and has no training or licensing to practice medicine.[7] Id. ¶ 4. Deems has never spoken

---

[6] Plaintiff's claim appears to be premised on a misunderstanding of Deems's role at CSP-Sac, which plaintiff believes to be the warden. See Pl.'s Dep. at 82:12-15, 84:24-25.

[7] Plaintiff disputes this fact with citation to § 91040.3 of the California Department of Corrections and Rehabilitation's Operations Manual, which provides: "The CMO or other physician director shall be responsible for all health care services at each facility." Deems, however, is the Chief

18

with plaintiff; never treated plaintiff; was never involved in diagnosing or treating plaintiff's back; was never involved in refusing to provide pain medication; and was never involved in scheduling back surgery. Id. ¶¶ 5-9.  Deems was also not involved in plaintiff's bandage changes or in responding to plaintiff's complaints of pain. Id. ¶¶ 17-18.

Deems's sole involvement in plaintiff's care is through the second level responses to plaintiff's healthcare appeals. Id. ¶ 3. In that role, Deems ensured that all requested actions have been addressed, that any follow-up actions from the first level of review had been completed, and that there was no deviation from policy and procedure. Id. As the second level reviewer, Deems relied on the medical determination of the clinician or surgeon who researched and reviewed the inmate's medical records. Id.

As a part of the review process at the second level of review, non-party Dr. Duc reviewed plaintiff's medical file and noted that plaintiff was recently seen by Dr. Nangalama, who prescribed pain medication, that the x-ray of plaintiff's spine was not conclusive, and that plaintiff had a return appointment scheduled for September 24, 2010, where he would be reevaluated for further work-up and treatment as indicated. Pl.'s Decl. Ex. B (ECF No. 77-3 at 21-22). Dr. Vuc determined that the pain medication was sufficient to treat plaintiff's pain. Id. Relying on Dr. Vuc's assessment, Deems partially granted plaintiff's grievance at the second level of review. Id.

Plaintiff appealed this decision on September 23, 2010, claiming that he remains in a lot of pain without relief from the Tylenol 3. Pl.'s Decl. Ex. B (ECF No. 77-3 at 18). He also claimed that his medical file was missing.

Plaintiff's grievance was denied at the third level of review on February 23, 2011. Pl.'s Decl. Ex. B (ECF No. 77-3 at 23-25); Deems Decl. ¶ 25. Plaintiff's claim that his medical file was missing was unsupported since the Director's Level of Review was able to review his medical records in considering his appeal.

////

_____

Executive Office, not the Chief *Medical* Officer. In any event, this provision of the Operations Manual does not create a dispute as to whether Deems is a medical provider.

Additionally, the reviewer noted that plaintiff's treatment plan was medically necessary as supported by the diagnostic information and judgment of the treating physician.

### 2. Appeal Log No. SAC HC 11013970

On April 28, 2011, plaintiff submitted a health care inmate grievance, Appeal Log No. SAC HC 11013970 ("Appeal 13970"), complaining as follows:

> [Illegible] issue is post surgical treatment by CDCR staff members resulting in negligence / deliberate indifference to my serious medical needs. My request(s) are based on "allegations [illegible]:
>
> - Extreme pain and suffering 2 days after surgery
>
> - Visible signs of "wound infection" spotted by Drs. Dhillon / Nangalama
>
> - New medication: Clindamycin HCL 150 mg caps up pills Torridol
>
> - Abnormal swelling of wound requiring trip to emergency room
>
> - Aspiration of blood performed + re-stitching of wound
>
> - C/O Fields refused to make certain I received "necessary care"
>
> - Nurse Cox refused to provide necessary dressing change of wound
>
> - Resulting in "man down" emergency situation (bleeding & pain)
>
> - Cox (Nurse) attempted to "throw away bloody shirt – evidence"
>
> - Cox made "retaliative [sic] remark" during crisis that she did not appreciate my mother calling prison to inquire about my care and making complaints." Cox also debated whether my dressing should be changed – twice daily – as ordered by doctor.
>
> My requests are necessary to eliminate having to "beg & demand" ordered medical care in a "timely manner" (without attitude)" and
>
> for "operating surgeon" to evaluate his surgery results and my condition.

Pl.'s Decl. Ex. C (ECF No. 77-3 at 27-33). Accompanying this appeal was a declaration signed by inmate Nathaniel Dixon, who claims to have witnessed institutional staff, including Nurse Cox, fail to timely respond to plaintiff's bleeding wound on April 20, 2011. By way of relief, plaintiff sought a referral to the SJGH operating surgeon to assess the wound and update his treatment plan. He also sought an order reprimanding Fields and Nurse Cox for deliberately failing to provide prompt medical attention.

20

Plaintiff's grievance was partially granted at the first level of review on June 15, 2011, by a non-party medical provider. See Deems Decl. Ex. B (ECF No. 62-4 at 22-23). The response indicated that plaintiff was seen by the surgeon on April 7, 2011 and May 6, 2011, and that he was seen by his treating physician on May 4, 2011 and May 11, 2011. It also indicated that Nurse Cox would provide plaintiff with "prompt medical attention," but that any issues regarding employee disciplinary matters are confidential and will not be disclosed in the appeals process.

Plaintiff appealed this decision on June 8, 2011, to exhaust his administrative remedies. Pl.'s Decl. Ex. C (ECF No. 77-3 at 29-30.)

Plaintiff's grievance was partially granted at the second level of review by defendant Deems on July 18, 2011. Pl.'s Decl. Ex. C (ECF No. 77-3 at 34); Deems Decl. ¶ 30. Dr. Duc again reviewed plaintiff's medical file and noted the that May 6, 2011, follow-up appointment with the surgeon at SJGH included an antibiotics prescription and an order for twice-daily dressing change. It was also noted that plaintiff was seen at the institution clinic on May 11, 2011, and that Dr. Nangalama noted a healed surgical wound on June 13, 2011. Per Dr. Duc, plaintiff could consider himself safe as related to his surgical wound.

Plaintiff appealed this decision on June 21, 2011. Pl.'s Decl. Ex. C (ECF No. 77-3 at 30.)

Plaintiff's grievance was then denied at the Director's Level of Review on January 27, 2012. Pl.'s Decl. Ex. C (ECF No. 77-3 at 36-38.) The decision affirmed the lower level decisions and further indicated that plaintiff was again seen on July 22, 2011, by his primary care physician, who noted that plaintiff's "old surgical wound on back well healed."

## C.      Analysis

First, Defendants move for summary judgment because plaintiff failed to exhaust his administrative remedies since neither of the two healthcare-related grievances make any mention of inadequate care by any of the defendants other than Nurse Cox. Plaintiff counters that the grievances are sufficient to exhaust his administrative remedies since they put the institution on notice of his claims and since the parties involved in his care could easily be identified through the investigation into his claims.

////

### 1. Appeal 11910

In Appeal 11910, filed on July 28, 2010, plaintiff complained that he had not yet been seen by a doctor following his July 2010 back x-ray and that he was forced "to endure pain without medication" by an unidentified "Sac 4 yard doctor." Defendants argue that this grievance is insufficient to exhaust plaintiff's administrative remedies because (1) plaintiff does not identify any individuals by name, as required pursuant to Cal. Code Regs. tit. 15, § 3084.2(a)(3), and (2) this grievance cannot possibly refer to any of the defendants since their allegedly unconstitutional conduct post-dates the filing of the grievance.

Plaintiff rightly points out that his failure to list all staff members involved in his inmate grievance, or to fully describe the involvement of staff members in the incident, does not necessarily preclude his exhaustion of administrative remedies. Reyes, 810 F.3d at 658. He does not, however, explain how Appeal 11910, filed in July 2010, exhausts his remedies as to Nurse Cox or Nurse Teachout, who allegedly violated plaintiff's constitutional rights after the April 2011 surgery, two months after this grievance was denied at the director's level of review. As for Dr. Dhillon, while she did treat plaintiff before the filing of Appeal 11910, plaintiff testified at his deposition that he has no claim against her relating to the care she provided before the April 7, 2011, surgery. See Pl.'s Dep. at 94:17-19 (ECF No. 62-9 at 42).

Defendants have thus carried their burden to show that Appeal 11910 fails to exhaust plaintiff's administrative remedies as to Nurse Cox, Nurse Teachout, or Dr. Dhillon. In turn, plaintiff failed to meet his burden to come forward with evidence showing that there is something in his case that made the administrative remedies effectively unavailable to him. Accordingly, the undersigned agrees with defendants that Appeal 11910 does not serve to exhaust plaintiff's administrative remedies as to these two nurse defendants or Dr. Dhillon.

On the other hand, Dr. Nangalama, Dr. Sahota, and Deems each participated in one form or another in the institutional review of Appeal 11910 and had an opportunity to right the wrong alleged by plaintiff: Dr. Nangalama interviewed plaintiff at the first level of review, Dr. Sahota participated in reviewing Dr. Nangalama's RFS, and Deems granted in part the grievance at the second level of review. Their participation is sufficient to have exhausted plaintiff's

1  administrative remedies as to them. See Gonzalez v. Ahmed, 67 F. Supp. 3d 1145, 1153-54 (N.D.

2  Cal. Sept. 9, 2014). See also Jett v. Penner, 439 F.3d 1091, 1096, 1098 (9th Cir. 2006) ("As

3  prison administrators, Dr. Peterson and [Warden] Cheryl Pliler are liable for deliberate

4  indifference when they knowingly fail to respond to an inmate's requests for help.").

### 2.  Appeal 13970

6  Turning now to Appeal 13970, filed on April 28, 2011, defendants argue that it cannot

7  serve to exhaust plaintiff's claims as to any defendant other than Nurse Cox because none of the

8  allegations made therein were sufficient to put the institution on notice of the allegations in

9  plaintiff's complaint. In other words, there are no allegations regarding delays in scheduling the

10  lipoma surgery, the inadequacy of pain medication, the inadequate bandage changes by anyone

11  other than Nurse Cox, or any reference to cancer-causing medication purportedly ordered by Dr.

12  Nangalama. In fact, plaintiff specifically limited his allegations to post-surgical care and, in that

13  regard, sought "to eliminate having to beg and demand ordered medical care in a timely manner

14  (without attitude) …."  In his opposition, plaintiff argues that Appeal 13970 exhausts his

15  administrative remedies in that it refers to his post-surgery treatment and specifically names

16  Nurse Cox and "CDCR staff members."

17  As plaintiff acknowledges, Appeal 13970 refers solely to post-surgical care, and therefore

18  any claims pre-dating April 7, 2011, and not covered by Appeal 11910 must be dismissed since

19  this appeal cannot serve to have exhausted them. This includes plaintiff's claim that defendants

20  Deems, Nangalama, Sahota, and Dhillon delayed the scheduling of his surgery and failed to

21  provide adequate pain relief before the surgery.

22  The question now is whether plaintiff's passing reference to "CDCR staff members"

23  encompasses his claims against all defendants who provided post-operative care. The undersigned

24  finds that it does not. The near entirety of the grievance and the inmate-witness declaration

25  accompanying it concern Nurse Cox and Correctional Officer Fields's provision of post-operative

26  care, specifically that which resulted in emergency treatment at SJGH. There is simply nothing in

27  the remainder of the grievance other than the conclusory reference to "CDCR staff members" that

28  would put the institution on notice of the nature of plaintiff's claims in this suit, including that Dr.

1    Dhillon and Dr. Nangalama allegedly denied him Vicodin as ordered by Dr. Gu; that Nurse

2    Teachout denied him pain medication before the bandage changes; that Dr. Nangalama, Dr.

3    Dhillon, Nurse Teachout, and Deems denied plaintiff bandage changes; or that Dr. Nangalama

4    prescribed plaintiff antibiotics that purportedly cause cancer.

5       As noted, the grievance focuses almost entirely on Nurse Cox's allegedly inadequate and

6    unprofessional provision of medical care despite doctors' orders, it includes an eye witness

7    statement addressing Nurse Cox's provision of care, and it is this defendant's provision of care

8    that was addressed at all levels of review. It also apparently resulted in an employee disciplinary

9    review as to Nurse Cox, which is related to one of plaintiff's two requests for relief in that

10   grievance (a reprimand of Nurse Cox). Insofar as the reviewers noted that plaintiff had been seen

11   by doctors, these references are in response to plaintiff's second request that he be seen by his

12   operating surgeon.

13       While the foregoing suggests that plaintiff exhausted his remedies as to Nurse Cox,

14   plaintiff has identified only three interactions where Nurse Cox is alleged to have violated his

15   constitutional rights, each of which occurred after he filed this grievance. Appeal 13970, by virtue

16   of its timing, is therefore not predicated on any of these interactions.

17       Nonetheless, assuming a "continuing violation" theory, this grievance may be able to

18   exhaust plaintiff's claim, but only partially. In the interactions identified by plaintiff, Nurse Cox

19   is alleged to have (1) denied dressing changes, (2) denied pain medication prior to the dressing

20   changes, and/or (3) retaliated against plaintiff for his mother's calls. But in Appeal 13970,

21   plaintiff complained only that "Nurse Cox refused to provide necessary dressing change of

22   wound," that "Cox also debated whether my dressing should be changed – twice daily – as

23   ordered by doctor," and that "Cox made 'retaliative remark' … that 'she did not appreciate my

24   mother calling….'"

25       In other words, Appeal 13970 does not include any claim that Nurse Cox denied any pain

26   medication. It thus failed to "provide enough information … to allow prison officials to take

27   appropriate responsive measures." Griffin v. Arpaio, 557 F.3d 1117, 1121 (9th Cir. 2009) (citing

28   Johnson v. Testman, 380 F.3d 691, 607 (2d Cir. 2004)). For this reason, the undersigned also

finds that plaintiff failed to exhaust his administrative remedies as to his claim that Nurse Cox denied him pain medication.

Based on the foregoing, the undersigned finds that the defendants have met their burden of demonstrating that there were available administrative remedies and that plaintiff did not exhaust them in Appeal 13970 as to any defendant other than Nurse Cox or Deems. As to Nurse Cox, plaintiff only exhausted his claims that she denied dressing changes and that she retaliated against plaintiff for his mother's calls to the prison.

## VI.     Motion for Summary Judgment

Having concluded that plaintiff failed to exhaust his administrative remedies as to some defendants and/or some claims, the court now considers defendants' motion for summary judgment on the ground that there does not exist a dispute of material fact as to any of the remaining defendants on plaintiff's Eighth Amendment claim.

### A.     Eighth Amendment Deliberate Indifference

"The treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Farmer v. Brennan, 511 U.S. 825, 832 (1994) (citing Helling v. McKinney, 509 U.S. 25, 31 (1993). To establish a violation of the Eighth Amendment, the prisoner must "show that the officials acted with deliberate indifference to threat of serious harm or injury to an inmate." Labatad v. Corrections Corp. of America, 714 F.3d 1155, 1160 (9th Cir. 2013) (citing Gibson v. County of Washoe, 290 F.3d 1175, 1187 (9th Cir. 2002).

The deliberate indifference standard involves both an objective and a subjective prong. First, the alleged deprivation must be, in objective terms, "sufficiently serious." Farmer at 834. Indications of a serious medical need "include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." Colwell v. Bannister, 763 F.3d 1060, 1066 (9th Cir. 2014) (citation and internal quotation marks omitted); accord Wilhelm, 680 F.3d at 1122; Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000).

Second, subjectively, the prison official must "know of and disregard an excessive risk to inmate health or safety." Id. at 837; Anderson v. County of Kern, 45 F.3d 1310, 1313 (9th Cir. 1995). A prison official must "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . must also draw the inference." Farmer, 511 U.S. at 837. Liability may follow only if a prison official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Id. at 847.

The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial "risk of serious damage to his future health . . . ." Farmer, 511 U.S. at 843 (citing Helling, 509 U.S. at 35). The Supreme Court has explained that "deliberate indifference entails something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with the knowledge that harm will result." Id. at 835. The Court defined this "deliberate indifference" standard as equal to "recklessness," in which "a person disregards a risk of harm of which he is aware." Id. at 836-37.

Deliberate indifference is a high legal standard. Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir.2004). "Under this standard, the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" Id. at 1057 (quoting Farmer, 511 U.S. at 837). "'If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.'" Id. (quoting Gibson, 290 F.3d at 1188).

**B.      Analysis**

      **1.      Dr. Nangalama**

The court limits its analysis of Dr. Nangalama's involvement in plaintiff's medical care to that conduct occurring in response to Appeal 11910, when this defendant had an opportunity to respond to plaintiff's complaints. As for Dr. Nangalam's other conduct, Dr. Nangalama was not involved in plaintiff's care before the filing of Appeal 11910, and as set forth supra, any involvement after this appeal has not been administratively exhausted.

26

There is no dispute of material fact as to Dr. Nangalama's role in responding to Appeal 11910: He examined plaintiff on August 31, 2010, at the first level of review, and he made note of the lipoma on plaintiff's back, which, though generally considered benign, was causing plaintiff localized pain. Because of the pain, Dr. Nangalama prescribed Tylenol 3, Ibuprofen, and aspirin, and he submitted a RFS referring plaintiff for routine surgery to remove the lipoma. When the RFS was denied for lack of sufficient detail, Dr. Nangalama re-examined plaintiff and re-submitted the RFS.

These facts demonstrate that Dr. Nangalama responded immediately to plaintiff's lipoma and complaints of pain by prescribing pain medication and referring him for surgery. While it is true that Dr. Nangalama's re-submitted RFS for surgery was granted in October 2010, several months before plaintiff's actual surgery, there is nothing in the record to suggest that this delay is attributable to Dr. Nangalama. Rather, the evidence highlights that Dr. Nangalama had no control over the scheduling of the lipoma surgery.

Because no reasonable juror could find deliberate indifference on these facts, the undersigned will recommend that summary judgment be entered for Dr. Nangalama.

**2.      Dr. Sahota**

As with Dr. Nangalama, the court limits its analysis of Dr. Sahota's involvement in plaintiff's medical care to that related to Appeal 11910. In that context, Dr. Sahota forwarded Dr. Nangalama's August 31, 2010, RFS to the MARC, which denied it for incomplete information. Dr. Sahota noted the denial, signed it on behalf of the MARC, and directed Dr. Nangalama to re-examine plaintiff and resubmit the RFS. When Dr. Nangalama did so on September 29, 2010, Dr. Sahota approved the re-submitted RFS. Like Dr. Nangalama, the evidence demonstrates that this defendant had no control over the scheduling of the surgery. Instead, scheduling was handled by the designated specialty clinic staff or personnel, which in this case was SJGH.

While plaintiff claimed in his pleading that he informed Dr. Sahota before Appeal 11910 of his pain, see Compl. ¶ 25, he submits no evidence to support this contention. To the contrary, the undisputed facts establish that plaintiff has never met Dr. Sahota, has never spoken to her, and has never been treated by her. Insofar as he relies on a theory of supervisory liability, the facts

before the court are insufficient to impose liability on this defendant.

Again, because no reasonable juror could find deliberate indifference on these facts, summary judgment should be entered for Dr. Sahota.

### 3. Deems

Defendant Deems's involvement in plaintiff's care is limited to his second level review of Appeal 11910 and Appeal 13970 where he ensured that all requested actions have been addressed, that any follow-up actions from the first level of review had been completed, and that there was no deviation from policy and procedure. In both appeals at issue here, Deems, who is not a medical provider and has no training or licensing to practice medicine, relied on Dr. Duc's assessment following a review of plaintiff's medical records.

It is true that an official who is not medically trained will not be shielded from liability for deliberate indifference if "a reasonable person would likely determine [the medical treatment] to be inferior." Snow v. McDaniel, 681 F.3d 978, 986 (9th Cir. 2012); see also McGee v. Adams, 721 F.3d 474, 483 (7th Cir. 2013) (stating that non-medical personnel may rely on medical opinions of health care professionals unless "they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner.") (internal quotation marks omitted).

Here, there are no facts from which a reasonable juror could infer that plaintiff was receiving substandard care that was not being addressed on appeal or that, if he was, this information was relayed to or otherwise known by Deems. Absent those facts, summary judgment must be entered for defendant Deems.

### 4. Nurse Cox

The court turns last to plaintiff's surviving claims against Nurse Cox. Broadly speaking, plaintiff accuses Nurse Cox of "acting cruelly" towards him, of failing to change his wound, and of failing to change it the requisite number of times per day. As for specifics, plaintiff does not remember and has not been able to determine on what days Nurse Cox allegedly acted with deliberate indifference.

////

Based on the record before the court, it is evident that plaintiff's claims arose after the May 6, 2011, appointment with Dr. Gu at SJGH. See Pl.'s Dep. at 100:15-20. At the first and third interactions identified by plaintiff, Nurse Cox allegedly denied him pain medication before the wound changes. As discussed supra, though, plaintiff failed to exhaust his claim as to the denial of pain medication.

At the second and third interactions, Nurse Cox is alleged to have denied plaintiff a wound change. The undisputed facts, however, reveal that plaintiff himself declined the wound change at the second interaction after deciding that he did not want to wait "a little while." No reasonable juror would find deliberate indifference on these facts. Assuming Nurse Cox did indeed deny a wound change at the third interaction, plaintiff has not submitted any evidence of injury attributable to it. See Jett, 439 F.3d at 1096. To the contrary, this conduct post-dates plaintiff's emergency visits to SJGH, suggesting no more emergency care was needed, and the record reveals that the wound was deemed healed by Dr. Nangalama and Dr. Duc as of June 13, 2011.

As for plaintiff's claim that Nurse Cox did not change his wound often enough, he has admitted that Nurse Cox changed his wound daily even though he would have preferred "twice a day, if not more." See Pl.'s Dep. at 96:9—97:7. Since Dr. Gu's orders specified only that the wound be changed "1-2 times a day," Gu Decl. Ex. F (ECF No. 62-11 at 38) (emphasis added), Nurse Cox's bandage changes were clearly within the recommended number of daily wound changes and therefore do not constitute deliberate indifference.

Plaintiff also takes issue with Nurse Cox's professionalism. However, "an institutional employee's verbal harassment or idle threats to an inmate, even if they cause an inmate fear, anxiety, or discomfort, do not constitute an invasion of any identified liberty interest." McClellan v. Bassett, 2006 WL 2079371 (D. Va. 2006).

For these reasons, summary judgment should be entered for Nurse Cox.

In light of the recommendation that all defendants are entitled to summary judgment, the undersigned declines to consider defendants' alternative argument that they are entitled to qualified immunity.

**VII.    Summary Judgment Pursuant to Federal Rule of Civil Procedure 56(f)**

The undersigned considers finally plaintiff's claim, liberally construed, that Nurse Cox retaliated against him. This claim is not encompassed in the defendants' moving papers.

Pursuant to Federal Rule of Civil Procedure 56(f),

> (f) Judgment Independent of the Motion. After giving notice and a reasonable time to respond, the court may:
>
> > (1) grant summary judgment for a nonmovant;
> >
> > (2) grant the motion on grounds not raised by a party; or
> >
> > (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.

"District courts unquestionably possess the power to enter summary judgment sua sponte, even on the eve of trial." Norse v. City of Santa Cruz, 629 F.3d 966, 971 (9th Cir. 2010) (footnote omitted). "However, the procedural rules governing Rule 56 apply regardless of whether the district court is acting in response to a party's motion, or sua sponte." Norse, 629 F.3d at 971 (citing Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989); Ind. Port Comm'n v. Bethlehem Steel Corp., 702 F.2d 107, 111 (7th Cir. 1983)).

"Reasonable notice implies adequate time to develop the facts on which the litigant will depend to oppose summary judgment." Norse, 629 F.3d at 972 (quoting Portsmouth Square, Inc. v. S'holders Protective Comm., 770 F.2d 866, 869 (9th Cir. 1985)). However, it is well settled that a "district court may grant summary judgment without notice if the losing party has had a full and fair opportunity to ventilate the issues involved in the motion." In re Harris Pine Mills v. Mitchell, 44 F.3d 1431, 1439 (9th Cir. 1995) (quoting United States v. Grayson, 879 F.2d 620, 625 (9th Cir. 1989)).

A viable claim of retaliation in violation of the First Amendment consists of five elements: "(1) an assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." Rhodes v. Robinson, 408 F.3d 559, 567 (9th Cir. 2005); accord Watison v.

Cartier, 668 F.3d 1108, 1114 (9th Cir. 2012); Brodheim v. Cry, 584 F.3d 1262, 169 (9th Cir. 2009).

As noted, plaintiff accuses Nurse Cox of retaliating against him for complaining to his mother about medical care. These complaints, however, are not constitutionally protected conduct because not every type of speech is protected. See Quezada v. Herrera, 2012 WL 1076130, at *4 (E.D. Cal. Mar. 29, 2012) (complaining that inmates had to wear hairnets not protected speech), aff'd, 520 F. App'x 559 (9th Cir. 2013); Thomas v. MCSO, 2009 WL 1311992, at *3 (D. Ariz. May 12, 2009) (calling an officer a derogatory name is not protected conduct); Ruiz v. Cal. Dept. of Corr., 2008 WL 1827637, at *2 (C.D. Cal. Apr. 22, 2008) (prisoner's comments expressing dissatisfaction about matters of personal concern to inmate was not a matter of public concern protected by the Free Speech Clause); Whitfield v. Snyder, 263 F. App'x 518 (7th Cir. 2008) (prisoner's complaint about prison job involved matters of personal, rather than public, concern and did not qualify as protected speech).

But even if the complaints were protected, plaintiff has not shown or even alleged that Nurse Cox's conduct chilled his communications with his mother. To the contrary, plaintiff has described his mother's calls as "diligent" and said that Nurse Cox spoke to his mother on "several" occasions, suggesting that plaintiff continued to complain to her. Judgment should thus be entered sua sponte on this claim as a matter of law.

**VIII.  Conclusion**

Accordingly, IT IS HEREBY ORDERED that the parties' May 24, 2018, stipulation (ECF No. 78) is adopted, and the defendants' June 8, 2018, replies (ECF Nos. 79-80) are deemed timely filed; and

IT IS HEREBY RECOMMENDED that

1.  Defendants' motion for summary judgment (ECF No. 62) be GRANTED IN PART as follows:

    a.  Granted as to defendants Dr. Dhillon, Nurse Teachout, and Nurse Cox (partial claim) for plaintiff's failure to exhaust administrative remedies; and

////

31

b.  Granted as to defendants Dr. Nangalama, Dr. Sahota, Deems, and Nurse Cox

        for the lack of a genuine dispute of material fact as to whether any was

        deliberately indifferent to plaintiff's medical needs;

2.  Summary judgment be entered sua sponte on plaintiff's retaliation claim against Nurse

    Cox; and

3.  This action be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, plaintiff may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections. Plaintiff is advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated:  August 24, 2018

_____
DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

/DLB7;
DB/Inbox/Substantive/bump1102.msj.v4